389 A.2d 1062

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Hillel LEVINSON, Appellee.**

Supreme Court of Pennsylvania.

Submitted Jan. 18, 1977.

Decided July 19, 1978.

Edward G. Rendell, 1st Asst. to Sp. Prosecutor, Bernard L. Siegel, Philadelphia, for appellant.

Schnader, Harrison, Segal & Lewis, Bernard G. Segal, James D. Crawford, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION

MANDERINO, Justice.

This is an appeal by the prosecution from an order of the Superior Court of Pennsylvania quashing an indictment against defendant, Hillel Levinson, (appellee). *Commonwealth v. Levinson,* 239 Pa.Super. 387, 362 A.2d 1080 (1970). The indictment resulted from the presentment of an investigating grand jury on which six grand jurors had been substituted more than a year after the grand jury was sworn and had begun to hear evidence against appellee.

Appellee Levinson, the Managing Director of the City of Philadelphia, was the subject of the Fourteenth Presentment of the January 1974, Special Investigating Grand Jury. The Fourteenth Presentment recommended his indictment on charges arising out of allegations that he solicited certain architects doing business with the City of Philadelphia to buy tickets to a large public dinner given by the Democratic City Committee during the 1972 presidential campaign, and out of allegations that his grand jury testimony concerning the alleged solicitations was inconsistent and incorrect.

Levinson moved to quash the indictment returned by the indicting grand jury which acted, in part at least, upon the Fourteenth Presentment. Following the disposition of various preliminary motions not relevant here, the trial court refused Levinson's motion to quash. Appellee then orally moved for certification of three questions pursuant to Sec-

tion 501(b) of the Appellate Court Jurisdiction Act of 1970, 17 P.S. § 211.501(b). The motion for certification was granted and the appeal was allowed by the Superior Court. The Superior Court reversed the trial court's order and quashed the indictment on the ground that the substitution of six grand jurors, more than one year after the investigating grand jury had been sworn, and at a time when the number of grand jurors still sitting equalled seventeen (two more than needed for a quorum), was unauthorized, and therefore invalidated the Fourteenth Presentment and consequent indictment.

The prosecution petitioned this Court for leave to appeal. We granted the petition and this appeal followed. We affirm.

The original complement of the January 1974 Grand Jury, consisting of twenty-three members, was sworn early in January of 1974. The jury was specially charged on January 31, 1974, to conduct an investigation into nine specific areas, including corruption in the government of the City of Philadelphia, and to continue the investigation into matters originally considered by the Special Investigating Grand Jury of June Term, 1972.

Between May 29, 1974, and mid-January, 1975, one grand juror died and five others were temporarily excused from service. On January 15, 1975, the five temporarily excused grand jurors were permanently excused, six additional grand jurors were selected and sworn, and the entire grand jury, as reconstituted, was again specially charged. The reconstituted 1974 Investigating Grand Jury then continued its investigation and proceedings. Thereafter, two more of the original jurors were excused without substitution. At the time it returned the Fourteenth Presentment recommending appellee's indictment, the grand jury consisted of fifteen members of the original panel of twenty-three plus the six members added in January of 1975.

The allegations of error raised by appellee in the trial court, and which were specified in the order granting appellee's motion for certification under Section 501 of the Appel-

late Court Jurisdiction Act of 1970, 17 P.S. § 211.501(b), are as follows:

"(a) The denial to defendant of either a preliminary hearing or access to grand jury minutes of the witnesses against him constitutes a plain denial of equal protection of the law;

(b) The substitution on January 15, 1975, of six new grand jurors for six grand jurors sworn on January 2, 1974 was unauthorized under the laws of Pennsylvania; and

(c) Former Grand Juror Karlinski was an unauthorized person in the grand jury on March 19, 1975 when the Fourteenth Presentment against defendant was voted."

As previously noted, the Superior Court reversed the trial court and ordered the indictments quashed on the basis of its analysis of allegation number two above. Because we agree with the Superior Court's disposition of the case on this basis, we do not address the other questions raised.

The prosecution raises several arguments in support of its position that the indictment should not have been quashed. Initially, it contends that the addition of the six new members to the investigating grand jury on January 15, 1974, was authorized by the Act of March 31, 1860, P.L. 427, § 41 (17 P.S. § 1152 and § 1233). Secondly, the prosecution argues that even if the addition of the six was not authorized by statute, the supervising judge had inherent discretionary power to add members to the grand jury, and therefore the presence of the additional six members was not unlawful. Furthermore, according to the prosecution, the substituted grand jurors should be afforded de facto legitimacy even if their substitution was unlawful.

Alternatively, the prosecution contends that if the addition of these six members was unlawful because not authorized by statute, nor by the supervising judge's discretionary powers, nor by their being given de facto authority, the presentment was not defective because the defendant has not shown that he was prejudiced by the inclusion of these six in the deliberations, or that even if the addition of the six was unlawful, and even if the presentment was defec-

tive, this defect was cured by the subsequent independent action of the indicting grand jury.

The Act of March 31, 1860, P.L. 427, § 41 (17 P.S. §§ 1152 and 1233) provides as follows:

"All courts of criminal jurisdiction of this commonwealth shall be and are hereby authorized and required, when occasion shall render the same necessary, to order a tales de circumstantibus, either for the grand or petit jury, and all talesmen shall be liable to the same challenges, fines and penalties as the principal jurors: Provided, That nothing herein contained shall repeal or alter the provisions of an act passed April 20, 1858, entitled 'An act establishing a mode of drawing and selecting jurors in and for the city and county of Philadelphia.'"

(This Act has been partially suspended: insofar as it applied to petit juries it has been replaced by Rules 1109 and 1125(3) of the Pa.R.Cr.P.) This statute, argues the prosecution, ". . . authorized the addition of members of the investigating grand jury, when the ability to form a quorum was seriously endangered by vacancies created through death or dismissal for cause."

The Superior Court correctly concluded that the Act does not provide authority for the substitution. The statutory material cited is clearly inapplicable to a situation such as the one presented here. The statute authorizes the calling of additional persons when the number originally constituting the *panel* from which the jurors are to be selected dwindles, either because of challenges or other circumstances, to such a point that it becomes too small in number to supply sufficient jurors to make the required twenty-three. The Act authorizes the calling of "talesmen" when "necessary" to provide a sufficiently large panel from which to select the twenty-three members of the grand jury. As stated in *Williams v. Commonwealth,* 91 Pa. 493 at 500 (1879):

"If all the jury do not attend, or if so many be challenged and drawn that there do not remain a sufficient number to make a jury there are at common law [several writs for

filling the panel], or by statute, the plaintiff may pray a *tales de circumstantibus.* . . ." (Emphasis in original.)

As further illustration of the error of the prosecution's argument concerning this point, we note that the Act refers to selection of jurors for both petit and grand juries. If, as the prosecution argues, the Act authorizes the summoning of additional grand jurors after the original panel has been sworn, it would similarly authorize the addition of petit juries after the original twelve had been seated and had begun to hear evidence. Such a proposition is so at odds with our concept of trial by jury that its absurdity needs no further comment. The Superior Court correctly observed that the grand jury is so composed as to include "built-in alternates." *Commonwealth v. Levinson,* 239 Pa.Super. at 401, 362 A.2d at 1088. With regard to *petit juries,* the common law rule was to the effect that a discharge of the entire jury was required whenever ". . . a defect in the jurors occurred due to the death of a juror, or [to] the illness or misconduct of a juror, or [to] other cause necessitating [a juror's] discharge." Annot. 84 A.L.R.2d 1288, 1290 § 1 (1962). In *Pennell v. Percival,* 13 Pa. 196 (1850), the court stated the common law rule, noting that where a juror, having been sworn, fails to appear, the court should either compel the juror's attendance or dismiss the jury and empanel another. *See also Lillie v. American Can and Foundry Co.,* 209 Pa. 161, 58 A. 272 (1904). Pa.R.Cr.P. 1108's provision for utilization of alternate petit jurors in the event that a mid-trial replacement is necessary avoids the discharge result compelled by the common law rule. By providing that the indicting grand jury have no more than twenty-three, and no less than fifteen, jurors, with twelve constituting the minimum required to return an indictment, see Pa.R.Cr.P. 201 and 210, a provision for alternate *grand* jurors similar to Rule 1108's provision for alternate *petit* jurors becomes unnecessary. As stated by the Superior Court,

"[t]he grand jury is imbued from the date of its empanelment with eight built-in alternates since twenty-three may be chosen and only fifteen need persevere."

*Commonwealth v. Levinson, supra,* 239 Pa.Super. at 401, 362 A.2d at 1088.

We reject the argument that there is statutory, common law, or inherent judicial authority for the "midstream" substitution of citizens as jurors after the original panel has been sworn. The prosecution has not cited, and our research has failed to uncover any Pennsylvania authority for the proposition that a new "juror" may be sworn and participate in the deliberations or voting of either a petit or a grand jury after the original jury has been sworn and begun its work.

The prosecution's reliance on *In Re Investigation of Jan. 1974 Phila. City Gr. Jury,* 458 Pa. 586, 328 A.2d 485 (1974), is misplaced. That case is completely inapposite to the issue here. No issue was presented in that case concerning whether citizens could be added and sworn as jurors in the middle of the jury's deliberations. That case held that a judge was given the authority by Pa.R.Cr.P. 204 to convene a grand jury on his own motion. *In Re Investigation of January 1974 Phila. City Gr. Jury,* thus has no bearing on whether a judge has authority to add citizens to the jury's complement after it has been convened, sworn, and has begun its deliberations. Thus, we find no merit in the prosecution's contention that six were properly added as "jurors" after the original jury had been sworn and had begun its work.

The prosecution also asserts that the additional six members should be afforded *de facto* legitimacy. Under the *de facto* approach, the official acts of one acting under color of title to a public office are given the same effect as the acts of a *de jure* official and are therefore legally binding until such *de facto* officials are ousted from office. *State Dental Council & Examining Board v. Pollack,* 457 Pa. 264, 318 A.2d 910 (1974). The *de facto* doctrine, however, is not applicable to the situation before us. When the official acts

of a public official are given effect even though it is later held that the official was not authorized to occupy the office, that official has acted *de facto, from the beginning of the proceeding* which is being challenged. *State Dental Council, supra.* The situation before us is not such a situation. It is analogous to one in which in the middle of a trial six jurors were excused for illness or hardship and six new persons began sitting as jurors in the middle of the trial. There is no authority to support the proposition that the *de facto* rule should be applied when such persons act as public officials only for a part of the relevant proceeding. The *de facto* rule might be applicable if six persons are originally sworn as a member of a grand jury or a trial jury when the jury begins its work but it later develops that such persons were not qualified because they were residents of the wrong county. The situation before us is entirely different. Even if we assume that the *de facto* rules applies to jurors the six persons involved in this case were *de facto* for only part of the relevant proceeding. If a *de facto*—but not *de jure* —judge were to sit for only the second half of a trial surely his verdict of guilt would not be accepted. Likewise, in this case, we refuse to extend the *de facto* principle to persons who might have become *de facto* in the middle of the relevant proceeding.

Appellee argues that the prosecution has waived this argument because it was not raised in the courts below, and that even if not waived, the doctrine is not applicable in the criminal law. Inasmuch as the prosecution argued both in the trial court and before the Superior Court that the substitution challenged by appellee was authorized, and that the presentment was not invalid because of their presence, we do not believe that the issue has been waived.

The prosecution argues that the presence of the six substituted grand jurors, even if unauthorized, created no defect in the presentment. For this proposition, the prosecution cites *Commonwealth v. Columbia Investment Corp.,* 457 Pa. 353, 325 A.2d 289 (1974). In *Columbia Investment,* a majority of this Court (Eagen, Nix, and Manderino, JJ., dissenting

on other grounds) held, inter alia, that the presence in the investigating grand jury room of a court appointed and sworn stenographer did not invalidate the presentment because the defendants had failed to demonstrate that they were prejudiced by the presence of such an unauthorized person.  The Superior Court concluded in the instant case that the presence of six unauthorized grand jurors, who had not seen or heard witnesses who testified during the early phases of the investigation had to be deemed "inherently prejudicial." *Commonwealth v. Levinson,* 239 Pa.Super. 404, 362 A.2d at 1089.  In so holding, the Superior Court distinguished *United States ex rel. McCann v. Thompson,* 144 F.2d 604 (2d Cir., *cert. den.* 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944)), a case holding that every grand juror need not be in attendance for the presentation of each piece of evidence considered by the jury.  The *Thompson* Court reasoned that the evidence presented to the grand jury was aimed at providing the accused's guilt and any evidence which a grand juror might have missed would only lessen the likelihood of guilt.  Therefore a juror's absence created no prejudice.  As stated by Judge Learned Hand in *Thompson:*

"On principle the objection [that not all the testimony was heard live by each juror] seems to us not well taken. Since *all the evidence adduced before a grand jury—certainly when the accused does not appear—is aimed at proving guilt,* the absence of some jurors during some part of the hearings will ordinarily merely weaken the prosecution's case.  If what the absentees actually hear is enough to satisfy them, there would seem to be no reason why they should not vote. *Against this we can think of nothing except the possibility that some of the evidence adduced by the prosecution might conceivably turn out to be favorable to the accused; and that, if the absentees had heard it, they might have refused to vote a true bill.* No one can be entirely sure that this can never occur; but it appears to us so remote a chance that it should be left to those instances in which it can be made to appear that the evidence not heard was of that character, in spite of

the extreme difficulty of ever proving what was the evidence before a grand jury. Indeed, the possibility that not all who vote will hear all the evidence, is a reasonable inference from the fact that sixteen is a quorum. Were the law as the relator argues, it would practically mean that all jurors present at the beginning of any case, must remain to the end, for it will always be impossible to tell in advance whether twelve will eventually vote a true bill, and if they do, who those twelve will be. The result of such a doctrine would therefore be that in a long case, or in a case where there are intervals in the taking of evidence, the privilege of absence would not exist. That would certainly be an innovation, for the contrary practice has, so far as we are aware, been universal; and it would be an onerous and unnecessary innovation."

144 F.2d at 607.

For the reasons that follow, we believe *Thompson* to be inapplicable to the present case. First of all, *Thompson* was concerned with the question of whether prejudice was caused to a defendant by the presence of unauthorized jurors on an indicting grand jury. In the instant case, we are concerned with an investigating grand jury where the alleged guilt of a party is not the primary issue. An investigating grand jury is charged with conducting an investigation into certain areas of suspected criminal activity, and the evidence relative to any one individual under investigation may well contain much that is exculpatory as well as that which is inculpatory. Based on its view of *all* the evidence—not just that evidence presented by the prosecution—the investigating grand jury may recommend that criminal charges be initiated against any particular individual.

In the instant case, six of the jurors who voted on the presentment all missed the same testimony. Even if we were to apply the *Thompson* rationale, it would remain valid only when the collective memory of the grand jury remains intact despite the sporadic absences of various individual members. When a substantial percentage of the total mem-

bership of the jury is absent from a significant portion of the presentation of evidence, it can no longer be said with confidence that the deliberations were not affected. In the instant case all six of the substituted grand jury members were sworn *after* defendant Levinson had initially testified before the January 1974 Grand Jury. They were exposed to Levinson's prior testimony only when that testimony was read to them by one of the prosecuting attorneys. To make matters worse, only those portions of appellee's prior testimony which the prosecuting attorney deemed "relevant" to the investigation were read to the reconstituted panel. Based on this reading of part of the testimony given by appellee and others prior to January 15, 1975, the six substituted jurors voted on the question of whether or not Levinson committed perjury, among other things, when he testified before the reconstituted grand jury on March 17, 1975. This procedure caused appellee substantial prejudice. The six grand jurors were added as a group in the middle of the investigation. They did not hear appellee's initial testimony. Furthermore, they heard the evidence in an order and fashion different from the original members, and indeed, did not even hear the same evidence as the rest of the jury because they were read only that testimony which the prosecuting attorney felt was "relevant" to the Fourteenth Presentment. Nevertheless, they were asked to decide whether in so testifying the defendant committed perjury.

In holding that the indictment should not be quashed because of the presence in the grand jury room of an unauthorized court stenographer, the majority in *Columbia Investment Corp., supra,* said,

" . . . neither appellees nor their counsel interposed objection to the presence of the stenographer and no prejudice has been alleged. The trial judge thus erred in quashing the indictments on this basis."

457 Pa. at 368, 325 A.2d at 297.

*Columbia Investment Corp.,* is clearly inapplicable to a situation, such as that in the instant case, where the accused was prejudiced by the unauthorized presence of six persons who

not only sat in the grand jury room but who actually participated in the discussions leading up to the presentment and voted on that presentment. As stated in *Commonwealth v. Hegedus,* 44 Pa.Super. 157, 165 (1910),

" . . . [T]he mere presence in the grand jury room, of a stenographer employed by the district attorney, by express statutory authority, 'as an assistant in his office,' for the purpose of taking down in shorthand, for the use of the district attorney, the evidence upon which an indictment is returned, does not invalidate the indictment, *in the absence of anything tending to show that he was present when the grand jury deliberated or voted upon the bill,* or that he participated in the proceedings in any other way than by taking notes of the testimony, or that the accused was injuriously affected thereby." (Emphasis supplied.)

Furthermore, Rule 209 of our Rules of Criminal Procedure specifies who may be present during grand jury sessions:

"The attorney for the Commonwealth, the witness under examination, and an interpreter when needed, may be present while the grand jury is in session, *but no person other than the jurors may be present while the grand jury is deliberating or voting."* (Emphasis added.)

The "jurors" referred to in Rule 209, of course, can only be authorized jurors. Although Rule 209 applies specifically only to indicting grand juries, the purpose behind its enactment, namely, the avoidance of the possibility that the jury will be influenced by considerations other than those stemming from the evidence presented to it, is equally applicable to an investigating grand jury.

Lastly, the prosecution argues that even if the substitution was unlawful, and even if that unlawful substitution created a defect in the presentment, the indictment need not be quashed because it was returned by a separate, independent, indicting grand jury, thus curing any defect or irregularity in the presentment. Citing *Commonwealth v. Evans,* 190 Pa.Super. 179, 154 A.2d 57 (1959), and *Commonwealth v. Gross,* 172 Pa.Super. 85, 92 A.2d 251 (1952), the

prosecution asserts that an indictment is presumed legal and regular, and that there is no proof in the record of the instant case that the indicting grand jury *relied primarily on the invalid presentment.* Therefore, according to the prosecution, any such defects are deemed cured by the indictment.

Appellee counters that he has no burden to show that a defective presentment prejudiced him before the indicting grand jury because such a burden would be an impossible one to meet in light of the cloak of secrecy surrounding grand jury deliberations. See Pa.R.Cr.P. 208 and 209. Furthermore, appellee asserts that the indicting grand jury merely "rubber stamps" the bill presented to it. *See Commonwealth v. Webster,* 462 Pa. 125, 130–133, 337 A.2d 914, 917–918 (1975), *cert. den.* 423 U.S. 898, 96 S.Ct. 201, 46 L.Ed.2d 131.

The Superior Court held that the defective Fourteenth Presentment " . . . *could* have provided the primary basis for the indictments," (Emphasis added) 239 Pa.Super. at 404, 362 A.2d at 1090, and that the indictments therefore should be quashed. Subsequent to the issuance of the Superior Court's opinion in this matter, the prosecution produced an affidavit, signed by Harry S. Tischler, former assistant attorney general, stating that he had been present before the indicting grand jury on the day it heard evidence on the bill of indictment concerning Levinson. According to the affidavit, the Fourteenth Presentment was read to the indicting grand jury in its entirety. Following that, according to the affidavit, the jury was presented with a summary of the testimony of two witnesses who had testified before the investigating grand jury too late to be mentioned in the presentment, and with the documentary evidence relevant to the transactions described in the indictments.

We first note that we reject any notion of an indictment by a regular grand jury based on the presentment of an investigating grand jury cures any and all irregularities or defects that may have occurred in the functioning of the investigating grand jury. To do so would be to conclude that no matter what an investigating grand jury does, or

how it functions it is to be considered above the law. An investigating grand jury must be subject to the law otherwise it can become an uncontrolled instrument interfering with the rights of citizens.

Ordinarily, courts will not quash an indictment based on inadequate, incompetent, or even illegal evidence. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Commonwealth v. Webster,* 462 Pa. 125, 337 A.2d 914 (1975). The reason behind this rule was stated by the *Calandra* court. Permitting grand jury witnesses to challenge the admissibility of the evidence sought by the grand jury, such as by invoking the exclusionary rule, would,

> "precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings. Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective. The probable result would be 'protracted interruption of grand jury proceedings,' effectively transforming them into preliminary trials on the merits. In some cases the delay might be fatal to the enforcement of the criminal law." (Citations and footnotes omitted.)

414 U.S. at 349–350, 94 S.Ct. at 620, 38 L.Ed. at 572. In addition to unduly interfering with the effective discharge of the grand jury's duties, invocation of the exclusionary rule, said the *Calandra* court, would achieve only a minimal and speculative advance of the rules purpose of deterring police misconduct. *Id.* 414 U.S. at 351–352, 94 S.Ct. at 621–622, 38 L.Ed.2d at 573.

Calandra's reasons for refusing to quash are not applicable here. In fact, Calandra's reasoning supports our conclusion that the indictments were properly quashed. In the instant case quashing the indictments does not interfere with the efficient functioning of either the investigating or the indicting grand jury. Quashing the indictment based as it was at least in part, on an invalid presentment, serves to assure regularity in the formulation and proceeding of the investi-

gatory grand jury. It serves as a judicial check upon the abuse of power of the investigating grand jury.

In *Commonwealth v. McCloskey*, 443 Pa. 117, 277 A.2d 764 (1974) cert. den. 404 U.S. 1000, 92 S.Ct. 559, 30 L.Ed.2d 552, we concluded that an indictment based "in part" on the impermissible testimony of a defendant given before an investigating grand jury would result in the quashing of the indictment. 443 Pa. at 147, 277 A.2d at 779. We do not now have before us the same situation as that in *McCloskey*, but as in *McCloskey* we conclude that an indictment based in part on the presentment of an investigating grand jury which did not function in accordance with law to the prejudice of appellant must be quashed. We therefore conclude that, having shown that that invalid presentment formed a part of the indicting grand jury's considerations prior to returning a true bill, appellee has established that the indictment should be quashed.

The order of the Superior Court quashing the indictment is affirmed.

ROBERTS, J., filed a dissenting opinion in which O'BRIEN, J., joins.

POMEROY, J., filed a dissenting opinion in which O'BRIEN, J., joins.

ROBERTS, Justice, dissenting.

Thirty-nine months ago, the 1974 Special Investigating Grand Jury probing corruption of officials of the City of Philadelphia issued its fourteenth Presentment recommending indictment of appellee Hillel Levinson, Managing Director of Philadelphia, on charges of extortion, violating the Philadelphia Home Rule Charter, prohibited political assessments, and false swearing. One month later, a separate, regular Indicting Grand Jury, upon reviewing the Presentment and hearing additional evidence, indicted appellee on all charges.

The Commonwealth's case against appellee never reached trial. Appellee filed numerous pre-trial motions, one of which requested the court to quash the indictment. The

court denied relief, but certified the issue for interlocutory appeal to the Superior Court. That court reversed (Spaeth, J., concurring and dissenting; Price, J., dissenting). We granted the Commonwealth's petition for allowance of appeal, and, in January, 1977, at the time fixed for oral argument, the Commonwealth and appellee submitted the case to this Court on briefs.

Even before confirmation of the Magna Charta in 1215, delays in administration of justice were considered just as evil as denial of justice itself. Today, seven and one-half centuries later, the same is true, perhaps with even greater force.

In cases involving criminal charges of political and governmental corruption, delays like those found here are especially disturbing. Despite substantial expenditures of prosecutorial, law enforcement, judicial, and other public resources, the merits of the charges have long remained unresolved, denying both the Commonwealth and the accused the opportunity for timely vindication. Most unfortunate, this demonstrated lack of timely resolution undermines public confidence in the effective and equal administration of the criminal law. All that is left is an unwarranted and unnecessary classic case of delay, totally defeating justice.[1]

Equally disturbing is the majority's erroneous resolution of the merits. The majority agrees with appellee that supervising Judge Takiff committed prejudicial error by adding six regularly selected jurors when the total number of original investigating grand jurors fell to seventeen because one juror died and five others were excused because of personal hardship.

[1]. Broadly interpreting the Hobbs Act, 18 U.S.C. § 1951, to reach beyond mere "racketeering," the Supreme Court of the United States recently recognized Congress' disapproval of the recalcitrance of some state governments to prosecute crimes like those here under investigation by the grand juries. *United States v. Culbert*, 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 34 (1978). It may be argued that the demonstrated record of delay in this case is symtomatic of state recalcitrance, which unnecessarily leaves the task of prosecuting state official corruption to the federal government. See generally Tuerkheimer, "The Executive Investigates Itself," 65 Calif.L.Rev. 597 (1977).

Federal courts, facing similar claims of prejudice, have refused to quash indictments where supervising courts have replaced grand jurors, *In re Meckley*, 50 F.Supp. 274 (M.D. Pa.1943), and where not all grand jurors heard all the evidence, *United States ex rel. McCann v. Thompson*, 144 F.2d 604 (2d Cir. 1944). In *In re Investigation of January 1974 Philadelphia County Grand Jury*, 458 Pa. 586, 328 A.2d 485 (1974), this Court, in October, 1974, refused to terminate this investigating grand jury, empanelled and charged nine months earlier. We held that it could properly continue its probe of suspected criminal activity even though its life might exceed the normal life of investigating grand juries.[2]

*Meckley, McCann,* and *Philadelphia Grand Jury* clearly support the proposition that the supervising court must have authority to take steps reasonably necessary to permit an extended grand jury to complete its work. Criminal activity, particularly where it involves governmental corruption, is often too extensive, and procedural objections too involved, to be dealt with in a period through which all original grand jurors are able to sit. These significant considerations, of great public concern, as well as the fact that fifteen of the original twenty-three investigating grand jurors, a lawful quorum, remained members of the grand jury until its termination, far outweigh appellee's vague and unsupported assertion of prejudice. Indeed, Judge Takiff's addition of six new jurors, properly chosen, sworn, and charged, was a reasonable and appropriate measure that in no way increased the likelihood that the original grand jurors would recommend indictment or otherwise injure appellee.

Following selection of the six new investigating grand jurors, the Commonwealth summarized its evidence before the full investigating grand jury. This too, concludes the majority, prejudiced appellee. I cannot agree. Summation

2. In its Final Report, the June 1972 Grand Jury, probing the same suspected criminal activity as the present one, recommended formation of a new grand jury "very promptly." Formation of the present grand jury, empanelled upon this recommendation, was sustained by this Court over a variety of procedural challenges. See *In re Investigation of January 1974 Philadelphia County Grand Jury*, 458 Pa. 586, 328 A.2d 485 (1974).

has been employed and approved in similar settings. E. g., *United States v. Mitchell*, 397 F.Supp. 166, 172 (D.D.C.1974) (no reversible error where prosecutor prepared summary of evidence for grand jurors). Nothing in the record demonstrates, or even suggests, that the Commonwealth mischaracterized its case or engaged in any other prejudicial conduct before the jurors. Rather, this established procedure of American jurisprudence enabled all jurors, both the fifteen original and six new, to assess the Commonwealth's case intelligently and should be approved.

Moreover, neither action in the proceedings before the investigating grand jury affected the validity of the regular, indicting grand jury's indictment. The indicting grand jury had before it the investigating grand jury's well-documented Presentment, itself evidence that indictable offenses may have been committed. Further, the indicting grand jury heard extensive additional testimony. Appellee has challenged the probative value of neither the investigating grand jury's Presentment nor the additional testimony heard by the indicting grand jury. An indicting grand jury, in discharging its responsibility of determining whether criminal charges should be instituted, may consider all probative evidence, including, for example, hearsay, which may be inadmissible at trial. *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974) (citing cases). As Mr. Justice Powell, speaking for the Supreme Court of the United States, has stated:

> "A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.' . . . Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. . .
> It is only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made."

*United States v. Calandra*, 414 U.S. at 344, 94 S.Ct. at 618, quoting *Branzburg v. Hayes*, 408 U.S. 665, 701–702, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1972). It is therefore difficult to

see, and the majority fails to state satisfactorily, how either Judge Takiff's empanelment of six additional jurors to the investigating grand jury or the Commonwealth's summation of evidence can serve as a basis for quashing the indictment. See *Commonwealth v. Levinson*, 239 Pa.Super. 387, 410, 362 A.2d 1080, 1093 (1976) (Price, J., dissenting).

In sum, the majority fails to recognize the fundamental purpose of grand juries in the administration of criminal justice. "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *United States v. Calandra*, 414 U.S. at 343–44, 94 S.Ct. at 618. The majority disregards this vital substantive distinction and proceeds to create remedies for rights that have not been injured and to find prejudice where none exists. Ignored also is the admonition of the Supreme Court in *Calandra* : "When the grand jury is performing its investigatory function into a general problem area . . . society's interest is best served by a thorough and extensive investigation." 414 U.S. at 344, 94 S.Ct. at 618. At this time in our societal and jurisprudential development, when the functions of investigating grand juries probing governmental corruption are so essential to the fair and equal administration of criminal justice, the majority's intrusion into the grand jury room and its unsupported findings of prejudice serve no public interest and only frustrate the important work grand juries must perform.

Finding no basis for the majority's action in quashing a proper and regularly returned indictment following presentment by an investigating grand jury, I dissent, would reverse the order of the Superior Court, and would affirm the order of the trial court refusing to quash the indictment.

O'BRIEN, J., joins in this dissenting opinion.

POMEROY, Justice, dissenting.

I believe the Superior Court was in error in ordering that the indictment of this appellee be quashed. I therefore

dissent from the order of affirmance and would reinstate the order of the court of common pleas which found the indictment valid and refused to quash it.

I am not persuaded that any error occurred in the substitution of six new members of the investigating grand jury, who were then fully briefed as to what had transpired before their selection. Even if their appointment was in error, however, it would seem clearly harmless for at least two reasons.

First, there was in existence at all relevant times a full legal quorum of the investigating grand jury. Second, the appellee's indictment of crime was not the act of the investigating grand jury but of the indicting grand jury, which had before it not only the presentment of the investigating jury but other evidence as well. The majority opinion seems to overlook the basic difference in the roles of these two bodies, and confuses the issue by citing authority some of which is relevant only to the indicting grand jury.

I would reverse and allow appellee's guilt or innocence to be determined by the final arbiter in a criminal case, the petit jury. Its role in the adjudicatory process has been totally aborted by today's decision.

O'BRIEN, J., joins in this dissenting opinion.