581 A.2d 1023

**Thomas J. FINUCANE, Individually and on behalf of all Pennsylvania Milk Consumers, Petitioner,**

v.

**PENNSYLVANIA MILK MARKETING BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 4, 1990.

Decided Oct. 26, 1990.

608

Thomas J. Finucane, Wingerd and Long, Chambersburg, for petitioner.

Thomas M. Crowley, Chief Counsel, Harrisburg, for respondent.

Allen C. Warshaw, with him, Donald A. Tortorice, Duane, Morris & Hecksher, Harrisburg, for intervenor, Pennsylvania Ass'n of Milk Dealers.

J. Jackson Eaton, III, Gross, McGinley, LaBarre & Eaton, Allentown, for intervenor, Lehigh Valley Dairies, Inc.

Before COLINS and SMITH, JJ., and SILVESTRI, Senior Judge.

COLINS, Judge.

Thomas Finucane (petitioner), individually and on behalf of all Pennsylvania milk consumers, petitions for review of the Pennsylvania Milk Marketing Board's (Board or respondent) order A–862, which created a bracket system in Milk Marketing Areas 3, 4, 5 and 6 under which the minimum price of milk products would change $.005 per gallon every time the cost of butterfat changes upward or downward $.06 per hundred weight. The order came about in response to the Pennsylvania Association of Milk Dealers' (PAMD or intervenors) petition and the changes in federal policy as to the pricing of the components of milk, specifically butterfat. The Board held hearings on July 19, 1989 and on January 5, 1990 to determine what adjustments needed to be made to the system of price setting in Pennsylvania in response to the Federal government's new policy. Order A–862 was adopted by unanimous vote of the Board's three members. The Petition for Review addressed to this Court was filed on March 2, 1990 raising objections to the order. PAMD and Lehigh Valley Dairy Center filed Notices of Intervention.

Petitioner raises the following issues for our re-

view:[1] (1) whether the notice of hearing was defective in that Pennsylvania Bulletin publication was provided only five days prior to the scheduled hearing; (2) whether the Board was illegally constituted since the consumer member was only designated as such subsequent to the Governor's appointment and confirmation by the Senate; (3) whether the Board's refusal to consider noncontrolled milk product sales is contrary to law; (4) whether the Board abused its discretion in establishing butterfat brackets based solely on the difference in the butterfat value of each milk product; and (5) whether the Board can be required on remand to provide a consumer refund through future adjustments and price orders. We will address these issues seriatim.

The first issue raised by petitioner concerns an alleged defective notice of hearing. It is undisputed that notice of the July 19, 1989 hearing was published in the July 15, 1989 Pennsylvania Bulletin, 19 Pa.B. 3081 (1989); was sent by first class mail to a list of nearly 800 individuals and businesses, dated July 5, 1989; and was published in six large metropolitan newspapers (Allentown, Scranton, Philadelphia, Lancaster, Johnstown and Pittsburgh). Petitioner himself received notice through first class mail because he is on the list of those persons requesting such notice. Petitioner contends that a fifteen day notice requirement is set forth in 45 Pa.C.S. § 906. That section states, in pertinent part:

> Whenever notice of hearing or of opportunity to be heard is required or authorized to be given by the Commonwealth government by or under any statute, or may otherwise properly be given, the notice, except in cases where notice by publication is insufficient in law, shall be deemed to have been given to all persons residing within this Commonwealth, ... if said notice shall be published

---

1. The setting of milk prices is a discretionary function relegated to the expertise of the Board. We may review the discretionary acts of public officials only upon a showing of fraud, bad faith, capricious action, or abuse of discretion. *Lily Penn Food Stores, Inc. v. Pennsylvania Milk Marketing Board*, 80 Pa.Commonwealth Ct. 266, 472 A.2d 715 (1984) (*Lily Penn III*).

in the bulletin at such time that the period between the date of publication as specified in section 903(a) (relating to effective date of documents) and the date fixed in such notice for the hearing or for the termination of the opportunity to be heard shall be:

(1) not less than the time specified for the publication of the notice by the appropriate statute; or

(2) not less than 15 days when no time for publication is specified by statute, without prejudice, however, to the effectiveness of any notice of less than 15 days where such shorter period is reasonable.

■ Petitioner is correct when he states that there is a fifteen day requirement for publication when the statute in question does not specify a time for publication. The Milk Marketing Law (Law), Act of April 28, 1937, P.L. 417, *as amended,* 31 P.S. §§ 700j–101 to 700j–1302, does not set out a time limit for notice of hearings, therefore, subsection (2), as set forth above, is applicable. However, a time period shorter than fifteen days is acceptable when its effectiveness is considered reasonable. In fact, the petitioner does not claim that he received no notice; he received notice by first class mail dated July 5, 1989 as did other individuals and businesses who requested such notice. The issue is not whether newspaper publication and first class mailing is set forth as an exception to 45 Pa.C.S. § 906, but whether notice herein was adequate.

[W]hat is constitutionally required is notice which is reasonably calculated, under all the circumstances, to inform the interested parties that action ... is pending. *Mullane v. Central Hanover Bank and Trust Company,* 339 U.S. 306 [70 S.Ct. 652, 94 L.Ed. 865] (1950); *Clark v. Commonwealth Department of Public Welfare,* 58 Pa. Commonwealth Ct. 142, 427 A.2d 712 (1981). Notice of administrative action which is mailed to the interested party's last known address has been found to be reasonable notice. *Yarbrough v. Department of Public Welfare,* 84 Pa.Commonwealth Ct. 208, 478 A.2d 956 (1984).

*Kobylski v. Pennsylvania Milk Marketing Board,* 101 Pa.Commonwealth Ct. 155, 159, 516 A.2d 75, 77 (1986). Under the circumstances of this case, we conclude that no prejudice occurred to any party and that the Milk Marketing Board did not abuse its discretion in finding that adequate notice afforded all interested parties an opportunity to be heard.

The next issue raised by petitioner concerns whether a consumer member was properly designated pursuant to the Milk Marketing Law. The Board argues that the consumer member issue was waived by petitioner because he failed to raise it before the Board prior to the filing of the petition for review. The Board is correct as to this general rule.[2] In *Ramsey v. Pennsylvania Milk Marketing Board,* 132 Pa.Commonwealth Ct. 74, 572 A.2d 21 (1990), this Court held that raising issues "before the Board *after* all hearings were held is insufficient to preserve them for this court." *Id.,* 132 Pa.Commonwealth Ct. at 77, 572 A.2d at 25 (emphasis in original). However, this issue could not have been raised before the Board, because Mr. Derry only announced his designation by the Governor (received by letter dated January 8, 1990) at an emergency sunshine meeting held on January 31, 1990.[3] Petitioner raised his objection at the first possible time, in his petition for review. Therefore, we will address the merits.

Section 201 of the Law states in pertinent part:

There is hereby created an independent administrative board ... consist[ing] of three members nominated and appointed by the Governor, by and with the advice and consent of two-thirds of all the members of the Senate,.... [O]ne shall be appointed to represent consumer interests and shall have the responsibility under the direction of the board for directing the executive secretary

**2.** Pa.R.A.P. 1551 states, in pertinent part, that: "[n]o question shall be heard or considered by the court which was not raised before the government unit...."

**3.** This announcement was made after the order was adopted.

to coordinate and supervise the Bureau of Consumer Affairs.

31 P.S. § 700j–201.

■ Specifically, petitioner argues that the member designated by the Governor to represent consumer interests pursuant to Section 201 of the Law was not confirmed by the Senate as the consumer member. The factual history is not in dispute. At the time of the July 19, 1989 hearing, Paul O'Hop was the consumer member of the Board. On October 23, 1989, Donald E. Lanius became a member of the Board, filling the spot vacated by O'Hop. Lanius was not designated as the consumer member. On January 31, 1990, Chairman J. Robert Derry announced his designation by the Governor as the consumer member. This designation occurred subsequent to the second hearing. Therefore, at the time of the second hearing, no Board member represented consumer interests. However, Chairman Derry did participate in the formulation of the findings, conclusions and order at issue here.

Petitioner's argument relates to the manner in which the consumer member was designated. When the Governor selected Chairman Derry as the consumer member, Derry already was a member of the Board. His designation subsequent to confirmation by the Senate prevented questions during confirmation proceedings that would have provided information as to his qualifications as the consumer member.

Petitioner analogizes Senate confirmation of the Board's consumer member to the procedures recognized by the legislature in the occupational licensing area. Section 3 of the Medical Practice Act of 1985, Act of December 20, 1985, P.L. 457, *as amended,* 63 P.S. § 422.3, indicates that the State Board of Medicine will contain two members who will represent the public at large. These public members, as well as the professional members of the Board of Medicine, are to be appointed by the Governor with the advice and consent of a majority of the Senate. The Administrative Code of 1929 (Code), Act of April 9, 1929, P.L. 177, *as*

*amended,* 71 P.S. §§ 51–732, provides further insight into legislative concerns when public members are provided for on licensing boards or commissions. Specifically, Section 813 of the Code provides in part the following:

(a) A member of a licensing board or commission designated in this act as representing the public at large shall be a private citizen and shall not:

(1) be a member of any profession or occupation which is regulated or licensed by the board, commission, or Bureau of Professional and Occupational Affairs;

(2) be related to or part of the immediate family of any member of the profession or occupation to be licensed or regulated by the particular board or commission;

(3) be affiliated in any way with the profession or occupation to be licensed or regulated; or

(4) hold any other appointive or elective public office or position within this Commonwealth or another state or the United States Government during the appointive term for which he serves.

(b) Any person not meeting the standards set forth herein shall be ineligible for membership on the board or commission as a public member.

71 P.S. § 279.4.

Section 813 of the Code also provides for ongoing educational conferences, so that public members can learn about their functions and develop and implement methods to protect the general public.

This Court is not suggesting that the consumer member of the Board be required to pursue a course of training, nor are we suggesting qualifications for the consumer member. We recognize that setting such standards is within the province of the legislature. What we are suggesting, however, is that the consumer member meet requirements implicit in the Law, a part of which purpose is protecting the public health and welfare. *City of Pittsburgh v. Pennsylvania Milk Marketing Board,* 1 Pa.Commonwealth Ct. 300, 275 A.2d 115 (1971), *appeal after remand, Milk Marketing Board Appeals,* 7 Pa.Commonwealth Ct. 180, 299

A.2d 197 (1973), *cert. dismissed, Alliance for Consumer Protection—Hill Dist. Branch v. Pennsylvania Milk Marketing Board,* 415 U.S. 902, 94 S.Ct. 1460, 39 L.Ed.2d 499 (1974).

Notwithstanding that both the legislative mandate and the intent of the Milk Marketing Law were not explicitly followed in the designation of Derry as the consumer member, we are constrained to hold that the Board is legally constituted under the de facto doctrine.

> [T]he official acts of one acting under color of title to a public office are given the same effect as the acts of a *de jure* official and are therefore legally binding until such *de facto* officials are ousted from office.... When the official acts of a public official are given effect even though it is later held that the official was not authorized to occupy the office, that official has acted *de facto*....

*Commonwealth v. Levinson,* 480 Pa. 273, 282–83, 389 A.2d 1062, 1066 (1978) (citations omitted).

■ We also note that the sole and exclusive remedy under a de facto scenario, is to try title or right to public office in a quo warranto action. *Spykerman v. Levy,* 491 Pa. 470, 421 A.2d 641 (1980).

> A quo warranto is addressed to preventing a continued exercise of authority unlawfully asserted, rather than to correct what has already been done under the authority. The gravamen of the complaint is the right to hold and exercise the powers of the office in contradistinction to an attack upon the propriety of the acts performed while in office....
>
> A quo warranto action must be brought to oust de jure, as well as de facto officers from their public positions.... Generally, quo warranto can be instituted only by the Attorney General or by the District Attorney. A private person may not bring a quo warranto action to redress a public wrong when he has no individual grievance. If a private person has a special right or interest, as distinguished from the right or interest of the public generally,

or he has been specially damaged, he may have standing to bring a quo warranto action.

*Id.,* 491 Pa. at 485–86, 421 A.2d at 649 (citations omitted).

Accordingly, we conclude that although the procedure followed to designate the consumer member of the Board was improper, we cannot, under present Pennsylvania law, hold that the Board was illegally constituted.

■ The third issue raised by petitioner concerns the Board's refusal to consider noncontrolled milk product sales. Petitioner argues that the Board failed to consider noncontrolled product sales in establishing the butterfat bracket system.

Section 801 of the Law provides in pertinent part:

The board shall *base all prices upon all conditions affecting the milk industry* in each milk marketing area, including ... a reasonable return on aggregate milk sales by milk dealers or handlers and stores selling milk. A reasonable return shall mean not less than a two and one-half percent [2½%] nor more than a three and one-half percent [3½%] rate of return based on net sales of *price-controlled products* determined in accordance with generally accepted accounting principles.

31 P.S. § 700j–801 (emphasis added).

The above-cited language indicates that net sales of price controlled products are used to determine a reasonable return. However, "[the] language [of Section 801] reflects legislative recognition of the varied elements affecting prices, along with imminent transition and growth in the industry." *Lily Penn Food Stores, Inc. v. Pennsylvania Milk Marketing Board,* 62 Pa.Commonwealth Ct. 597, 603, 437 A.2d 485, 489 (1981) (*Lily Penn I* ). Therefore, prices are to be determined by considering all conditions affecting the milk industry. *Id.*

The Board argues that it did not commit an abuse of discretion in failing to consider noncontrolled product sales in calculating a reasonable return. In finding of fact No. 14, the Board stated: "The Board further finds that the

testimony presented by PMMB staff is credible and substantial but that non-controlled product sales cannot be considered in making these adjustments. However, increases and decreases in raw product costs caused by changing butterfat differentials should be taken into account when setting the adjustments."

In reviewing the record it appears that the Board, in establishing the butterfat bracket system, considered price controlled products in setting the "reasonable return" but also heard credible testimony with regard to the sale of non-controlled products.[4] Therefore, we conclude that the Board did consider "all conditions affecting the milk industry," but at the same time set the rate of reasonable return "on net sales of price-controlled products."

■ Petitioner next raises the issue concerning the establishment of butterfat brackets based solely on the difference in the butterfat value of each milk product. This Court addressed this very issue in *Finucane v. Pennsylvania Milk Marketing Board,* 132 Pa.Commonwealth Ct. 85, 572 A.2d 27 (1990). *See also Lily Penn III.* However, the present order is *not* directed to setting product price differentials between various milk products. The purpose of the present order is to set forth a method by which changing costs of butterfat will be passed through to the consumer and will reflect the cost differences in butterfat. In fact, petitioner "agrees that the brackets in the Order accurately reflect the cost differences resulting from butterfat differential changes." Petitioner's Brief, P. 17. Since we conclude that petitioner misconstrues the purpose of the Board's order and agrees that the brackets accurately reflect the cost differences, this argument must fail.

4. Expert testimony in the record indicates that the prices of ice cream and other noncontrolled products increase or decrease when the cost of the raw product increases or decreases. Testimony further indicated that the prices of noncontrolled products fluctuate with market demand. However, there was no statistical evidence of record that ice cream profits will increase because of the lower cost of butterfat, thereby increasing profits overall to the detriment of the consumer.

Petitioner's last issue questions whether the Board can be required to provide a consumer refund for future adjustments and price orders. This issue was raised in *Milk Marketing Board Appeals*, 7 Pa.Commonwealth Ct. 180, 299 A.2d 197 (1973), *cert. dismissed, Alliance for Consumer Protection–Hill Dist. Branch v. Pennsylvania Milk Marketing Board*, 415 U.S. 902, 94 S.Ct. 1460, 39 L.Ed.2d 499 (1974), wherein the Court discussed the differences between utility rate cases allowing for refunds and the impossibility of refunding milk consumers. The Court stated:

> First, the statutes which set forth the authority of the administrative agency usually specifically refer to refunds for overcharges by the utility. Secondly, in utility cases, there are metered sales from which the utility can readily determine the amount of the refund due each of its customers. It is recognized ... that the consuming public makes millions of purchases of milk and milk products in a year, creating an almost impossible circumstance under which specific refunds could be determined.
>
> Administrative agencies in this Commonwealth have only those powers and authority granted to them by the Legislature. Regulatory agencies can do no more than the law permits. There is no specific statutory authority granted to this Board to grant refunds.

*Id.* 7 Pa.Commonwealth Ct. at 187–88, 299 A.2d at 200. To order the Board to grant refunds would constitute a usurpation by this Court of a legislative function, and that we are not prepared to do. Therefore, we conclude that if petitioner wishes to seek such relief, he should do so by way of the legislative process.

Accordingly, for all the reasons stated above, the Board's order must be affirmed.

## ORDER

AND NOW, this 26th day of October, 1990, the general order of the Pennsylvania Milk Marketing Board, No. A–862, is affirmed.